**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-160-6 (TJK)** |
| **v.** | : | |
| | : | |
| **RYAN ASHLOCK,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that the Court sentence defendant Ryan Ashlock to 135 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

## I.     Introduction

Defendant Ryan Ashlock, 23 years old and currently working in food production, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Ashlock pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1). As explained herein, a sentence of incarceration is appropriate in this case because of factors including

---

[1] Although the Statement of Offense in this matter, filed on June 14, 2022 (ECF No. 148 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

(1) Ashlock's preparation for the offense, including anticipation of violence, coordination with other Proud Boys, and outfitting with tactical equipment; (2) his direct physical contributions to the riot, including ripping up a fence and pulling on a barrier that police were attempting to secure; and (3) his post-offense statements advocating further political violence.

The Court must also consider that Ashlock's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Ashlock's crime support a sentence of 135 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 148 (Statement of Offense), at 1-3.

### Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd

already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.





*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Defendant Ashlock's Role in the January 6, 2021 Attack on the Capitol*

Ashlock was a member of the Proud Boys, a nationalist organization with multiple U.S. chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values. The group has an initiation

process for new members, which includes the taking of an "oath." Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.

Ashlock began planning for January 6 at least as early as December 28, 2020. Chat messages recovered from his phone show that, during that timeframe, he corresponded with other Proud Boys members about travel arrangements and about the potential for violence. When a member of Ashlock's chat group said that "[w]e will be headed back [home] on the 7th, either to prepare for war or celebrate a trump victory," Ashlock responded, "Yep. Best part is demorat [sic] cities and states will turn into 4th world shit holes." The conversation then turned to what types of weapons the group should bring. One member remarked, "I think we will roll with pistols for self defense, and leave the long guns at home. Shit gets that bad ill pluck one off of some dead schmuck." Ashlock replied, "Hah. Sure." During these discussions, other topics of conversation included plans to engage in violence against "Antifa" and Black Lives Matters supporters; to obtain and use two-way radios, medical supplies, weapons, and other equipment; and to conceal their identities.

As part of his preparations for January 6, Ashlock also outfitted himself with protective gear and a can of pepper spray. During the attack on the Capitol, Ashlock would wear a tactical vest and goggles and carry the pepper spray. Ashlock also brought a handgun on the trip, but he did not bring the firearm into the District of Columbia.

On January 6, Ashlock joined a large group of Proud Boys and others who marched from the Washington Monument to the Capitol, walked from the west side of the building to the east side and back again, and then paused nearby for a short time. Then, under the direction of senior Proud Boys leaders, the group marched to Peace Circle where they were among the first to breach

8

police barriers and enter the restricted areas.  Ashlock was part of the mob that stormed past police lines, tossing and toppling barriers as it went.  In fact, as shown in a video of the crowd's surge, Ashlock personally tore down a piece of black fencing as he made his way deeper into the restricted area and toward the building:



As the West Front became engulfed in the chaos described above, Ashlock remained on the grounds and made his way to the front of the crowd, where he personally interfered with law enforcement's efforts to control the crowd.  A video taken from an elevated vantage point shows police struggling to maintain a defensive barrier of bicycle racks against the crowd seeking to dismantle them in the push toward the building.  The video shows Ashlock at the forefront of that crowd; he can be seen maintaining his grip on a piece of bike rack despite being doused with a powerful blast of chemical spray to the face.  At this moment Ashlock's preparations paid off, as his goggles allowed him to hold his position despite the best efforts of the officers defending the Capitol:



An officer finally succeeded in breaking Ashlock's grasp on the barrier using the force of a baton:



During this same timeframe, as Ashlock admitted in a consensual interview prior to his arrest, he stepped on a taser wire in an attempt to prevent police from using the weapon to subdue another rioter.

Shortly thereafter, Ashlock left the Capitol grounds.  He did not enter the Capitol building.

*Subsequent Violent Rhetoric*

After Ashlock left the Capitol, but while the riot was still in progress, his mother sent him a text message telling him "You need to get away from the building."  Ashlock replied that he had "[b]een back home for a while," adding: "Fuck all these pussy liar politicians.  Trump should have

them all executed."   That same evening, a member of a group chat in which Ashlock was participating said, "Gents this was needed […] A show of force to the dems." Ashlock responded, "[t]o the government." Several days later, on January 10, 2021, Ashlock messaged to others, "America needs a civil war. The government can't win one and the rest of the world goes into chaos with us."

*The Charges and Plea Agreement*

On February 18, 2021, the United States charged Ashlock by criminal complaint with violating 18 U.S.C. §§ 371 (conspiracy); 231(a)(3) (obstruction of law enforcement during civil disorder); 1512(c)(2) (obstruction of an official proceeding); and 1752(a)(1) and (2) (entering and remaining in a restricted building or grounds without lawful authority).  ECF 5.  On February 26, a federal grand jury returned an Indictment charging Ashlock and five others with those same offenses and charging co-defendant William Chrestman with additional offenses.  On January 12, 2022, the grand jury returned a Superseding Indictment charging the same offenses.

On June 14, 2022, pursuant to a plea agreement, Ashlock pleaded guilty to Count 5 of the Superseding Indictment, charging him with a violation of 18 U.S.C. § 1752(a)(1), entering and remaining in a restricted building and grounds without lawful authority.  By plea agreement, Ashlock agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Ashlock now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and the U.S. Probation Office, Ashlock faces up to one year of imprisonment and a fine of up to $100,000. Ashlock must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

**The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

According to the Presentence Investigation Report (PSR), the U.S. Probation Office calculated Cordon's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 8 |

*See* PSR at ¶¶ 118.

The government respectfully raises one point of disagreement with the Guidelines analysis in the PSR.  While the PSR assigns a base offense level under Guidelines §2A2.4, the government submits that Ashlock's offense of conviction calls for the application of Guidelines §2B2.3, as stipulated in the plea agreement.  Under either approach, the advisory custody range is the same (0 to 6 months).  An explanation of the government's position follows.

To date, most defendants sentenced for violations of 18 U.S.C. § 1752 in connection with the events of January 6, 2021 have been sentenced for violations of § 1752(a)(1) ("Entering and Remaining in a Restricted Building") or § 1752(a)(2) ("Disorderly and Disruptive Conduct in a Restricted Building").  Under the Guidelines, a defendant convicted of an 18 U.S.C. § 1752 offense

is subject to an advisory guideline range under either U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) or § 2B2.3 (Trespass). *See* UNITED STATES SENTENCING COMMISSION GUIDELINES MANUAL (2021 edition), at Appendix A.  If more than one Chapter Two Guidelines provision may apply to a particular offense, the court should "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2 cmt. n.1; *accord* Appendix, Introduction. The "most appropriate" of the two potentially applicable guideline provisions is the one that best reflects the "offense conduct charged" in the count of conviction. U.S.S.G. § 1B1.2 cmt. n.1; *accord id.* § 1B1.2(a).

Under this standard, one Chapter Two Guidelines provision is appropriate for a violation of 18 U.S.C. § 1752(a)(1), and another Chapter Two Guidelines provision applies to a violation of 18 U.S.C. § 1752(a)(2).  For Section 1752(a)(1), which criminalizes "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority," the most appropriate Guideline is § 2B2.3, which covers "Trespass."  By contrast, for Section 1752(a)(2), which criminalizes "engag[ing] in disorderly or disruptive conduct" that "in fact, impedes or disrupts the orderly conduct of Government business or official functions," the most appropriate Guideline is § 2A2.4, which applies to "Obstructing or Impeding Officers."  Because a defendant cannot "in fact" impede government business without also impeding and obstructing officers—as the defendant here did—U.S.S.G. § 2A2.4 supplies the correct Guideline.

The foregoing analysis is supported by a review of plea agreements and the government's sentencing memoranda (where available) in Capitol Breach cases in which a defendant pleaded to an offense under 18 U.S.C. § 1752, and in which that offense was the most serious offense of conviction, as well as a review of the Presentence Investigation Reports (PSR) in those cases

(where available).  That review, which is current as of June 10, 2022, is summarized in detail in a

Supplemental Sentencing Memorandum in *United States v. Sidorski*, (1:21-cr-48-ABJ), ECF 45.

Based on the foregoing, the government submits the Guidelines calculations should be as

follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Trespass on restricted grounds (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See also* ECF 147 at 2-3 (Plea Agreement containing parties' agreement to application of §2B2.3).

The U.S. Probation Office calculated Ashlock's criminal history as a category I.  PSR at ¶

60. Accordingly, the U.S. Probation Office calculated Ashlock's total adjusted offense level, after

acceptance, at 8, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at

¶¶ 115.  An offense level of 4, as contemplated by the plea agreement and as recommended by the

government, would result in the same range.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate

sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and

fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies

the factors a court must consider in formulating the sentence. Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 135 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution..

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a "grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ashlock's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ashlock, the absence of violence against persons is not a mitigating factor.  Had Ashlock engaged in such conduct, he would have faced additional criminal charges.

The most important factors in Ashlock's case are his preparation for the offense in coordination with other members of the Proud Boys, his physical engagement with multiple crowd-control barriers inside the restricted Capitol grounds, and his post-offense advocacy of politically motivated violence.

To begin, Ashlock's preparations for January 6 show that he anticipated engaging in violent confrontation that day and refute any notion that his intentions were to protest peacefully at the Capitol.  Making matters worse, Ashlock undertook these preparations in coordination with an organized group of similarly violence-oriented individuals, the Proud Boys.  These factors

contributed substantially to Ashlock's conduct at the Capitol: his coordination with the Proud Boys allowed him to be part of the initial rush through the barricades that the group helped precipitate, and his possession of protective goggles allowed him to withstand a blast of pepper spray by police officers trying to repel the attack.

Compared with other defendants convicted of the same offense, Ashlock also engaged in more serious physical conduct within the restricted area.  As shown above, Ashlock tore down a piece of fence during the initial storming of the barricades, and he later struggled with officers in a tug-of-war over a piece of bike rack, holding tight to the barrier despite being sprayed in the face and only letting go when officers forced him off with a baton.  Ashlock admitted to agents that he also tried to interfere with an officer's attempt to subdue another riot with a taser.

Finally, Ashlock's multiple instances of violent rhetoric in the hours and days following the event show that, despite leaving the grounds earlier than many rioters, Ashlock experienced no regret or contrition for his actions.  To the contrary, he agreed with the proposition that the violence was "needed," and he advocated further violence to the point of "civil war."  These remarks prove that Ashlock's participation in the riot was not the result of a sudden impulse or mob mentality; it was fully consistent with his stated desires.

Ashlock's conduct is mitigated to some degree by the fact that he did not enter the Capitol building.  However, this factor does not justify a sentence below government's recommended sentence of 135 days in custody.  To the contrary, this mitigating factor was reflected in the plea offer extended by the government, which involved the dismissal of three felony offenses charged against Ashlock as well as the more serious misdemeanor count, Count Six, charging disorderly conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2).

Accordingly, the nature and the circumstances of this offense establish a clear need for a sentence of incarceration in this matter.

### B.   The History and Characteristics of Ashlock

Ashlock's history and characteristics do not weigh substantially in the direction of a higher or a lower sentence.  He appears to have had a stable, healthy home life as the youngest of four children.  PSR ¶¶ 66-68.  His upbringing—which included normal hobbies and a high school education—provides no basis to conclude that Ashlock was driven to criminal activity by factors outside his control.  PSR ¶¶ 68, 90.  If anything, as an Eagle Scout, Ashlock was exposed to civic virtues, PSR ¶ 69, that would have made the violent attack on the Capitol anathema to him.  Despite all these advantages, Ashlock took part in a serious crime.  Accordingly, despite his lack of a criminal record, Ashlock's history and characteristics justify a sentence of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Given Ashlock's association with a violent extremist group and his post-riot lack of remorse, the need for specific deterrence in this case is acute. Ashlock's sentence must leave no doubt in his mind that further political violence on part—whether as part of the Proud Boys or otherwise—is not worth the consequences.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Ashlock based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Ashlock has pleaded guilty to Count 5 of the Superseding Indictment, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully

---

[2] Attached to this sentencing memorandum, as Exhibit A, is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan); *cf. United States v. De La Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("a Guidelines sentence can create an unwarranted disparity") (citing *Kimbrough v. United States*, 552 U.S. 85, 91 (2007)).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

One point of comparison is William Tryon, who, like Ashlock, pleaded guilty to violating 18 U.S.C. § 1752(a)(1). *See United States v. Tryon*, no. 1:21-cr-420 (RBW). Tryon entered the restricted area later (unlike Ashlock he was not part of the initial rush across the barriers), but similarly to Ashlock, Tryon was undeterred by the violence on the west front and, like Ashlock, persisted despite being subjected to the use of force by police officers (both men were pepper

sprayed and hit with a baton).   *Id.*, ECF 23 at 4 (government's Sentencing Memorandum).   Tryon

is also comparable in that he made statements after the riot that unapologetically celebrated it as a

justified action.   *Id.* at 5-6.   Unlike Ashlock, Tryon spent a short time (5-8 minutes) inside the

Capitol building.   *Id.*   In all other respects, however, Ashlock's conduct was worse; for example,

his coordination as a member of the Proud Boys, his use of protective gear and possession of

pepper spray, and his direct physical manipulation of barriers in the restricted area.   Tryon received

a sentence of 50 days of incarceration followed by 12 months of supervised release.   *Tryon*, no.

1:21-cr-420, ECF 28.   Because of the preponderance of aggravating factors in Ashlock's case, his

sentence should be greater.

Another comparable defendant is Samuel Fisher, who similarly pleaded guilty to one count

of violating 18 U.S.C. § 1752(a)(1).   *See United States v. Fisher*, no. 1:21-cr-142 (CJN).   Similar

to Ashlock, Fisher embraced a likelihood of violence in advance of January 6, including the

anticipation of "war."   *Id.*, ECF 35 at 4.   Both men brought firearms on their trip to the D.C. area.

*Id.* at 7.   But unlike Ashlock, Fisher did not bring or use protective gear, nor did he undertake his

preparations and offense conduct in coordination with the Proud Boys.   Fisher entered the Capitol

building while Ashlock did not, but Fisher's time inside was relatively brief and his conduct

unremarkable.   *See id.* at 9-13.   Both men celebrated the event afterward.   *Id.* at 14.   Although

Fisher had some criminal history, his guidelines range was the same as Ashlock's.   *Id.* at 18.   He

received a sentence of 120 days' imprisonment followed by 12 months of supervised release.   *See*

*Fisher*, 1:21-cr-142 ECF 43.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is

"only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 135 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov